```
1                    UNITED STATES DISTRICT COURT
2                    EASTERN DISTRICT OF VIRGINIA
                         ALEXANDRIA DIVISION
3    _____

4                                 )
     UNITED STATES OF AMERICA      )
5                                  )  Case No. 1:15-cr-164
               v.                  )  Alexandria, Virginia
6                                  )
     ALI SHUKRI AMIN,              )  August 28, 2015
7                                  )  9:03 a.m.
               Defendant.          )
8                                  )
9    _____

10

11                   TRANSCRIPT OF SENTENCING

12           BEFORE THE HONORABLE CLAUDE M. HILTON

13                UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19   APPEARANCES:

20   For the United States:   Michael Ben'Ary, Esq.

21   For the Defendant:       Joseph T. Flood, Esq.
                              Defendant Ali Shukri Amin, in
22                            person

23    Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR

24   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.
25
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  Criminal No. 2015-164, United States of
 3    America v. Ali Shukri Amin.
 4            MR. BEN'ARY:  Good morning, Your Honor.  Michael
 5    Ben'Ary for the United States.
 6            MR. FLOOD:  I'm Joseph Flood on behalf of Mr. Amin.
 7            THE COURT:  Mr. Flood, have you and your client had an
 8    opportunity to review this presentence report?
 9            MR. FLOOD:  We have, Your Honor.
10            THE COURT:  Are there any corrections you wish to make
11    to it?
12            MR. FLOOD:  No, sir.  We had a few minor corrections
13    that we provided to the probation officer, and she's
14    incorporated them into the new draft.
15            THE COURT:  All right.  Is there anything you want to
16    say at this time?
17            MR. FLOOD:  Yes, Your Honor.
18            First, I wanted to acknowledge several people who have
19    sent letters to the Court and are here today on behalf of Ali
20    Amin.  His mother, Amani Ibrahim; his stepfather, Yassir Rustum;
21    his biological father, Shukri Abdelirahim, who has come from the
22    United Arab Emirates to be here today in support of his son;
23    Khadija Hussain, Ali's grandmother; Tariq Ibrahim, his uncle;
24    and his uncle's sons, Ahmed and Mohamed.  Those are Ali's
25    cousins.  His aunt, Hala Eltahir, and her children, Saja, Ali,
```

1    and Samin.

2          Mahader Hassan Abdulomoiem, Gigi Rajaa, Kassir Abbas

3    and her son, Morman al-Dorani, and Imam Sheikh Mustapha and Imam

4    Sheikh Mahir, two imams that he had contact with prior to his

5    arrest and he's continued to interface with them.

6          We're here today on a sentencing memo.  I don't intend

7    to go into it in great depth.  It's a long memo talking about

8    the numerous factors that support a downward departure and a

9    downward variance.  The relief that we're seeking is a sentence

10   of 75 months and no fine, and we've asked for two

11   recommendations.

12         The first is that any period of incarceration begin

13   with an assignment to FCC Butner, and that he not be assigned to

14   the Bureau of Prisons, Communications Management Unit.  We

15   understand that those recommendations, if handed down by this

16   Court, are not binding on the Bureau of Prisons, but they're

17   something that will be taken into account.

18         And we also ask that any period of incarceration

19   include that the last year be served in a community reentry

20   program.  In our sentencing memorandum, we've talked about a

21   program that is designed for counter-radicalization.  We think

22   that Mr. Amin is well on his way to addressing that on a

23   personal level and has done so throughout these proceedings and

24   would benefit from being in the community in a safe environment

25   while he -- that continues on a professional level.

1           The rest of my comments are going to be primarily

2    focused on responding to the government's sentencing memorandum.

3    And I start by just pointing out that the two cases that they

4    rely upon, which I think we distinguished aptly in a supplement

5    and reply that we filed yesterday, *United States v. Chesser* and

6    *United States v. Morton*, we don't think that they're applicable.

7           And just one other fact as I was preparing my comments

8    for today, I read the sentencing memorandum submitted by the

9    United States in both of those cases.  In *Chesser* it ran 14

10   pages, and in *Morton* it ran ten.  A majority of that writing was

11   about the detailed criminal activity of both of those defendants

12   who were involved in a conspiracy to try to murder two prominent

13   American -- or three prominent American cartoonists.

14          Throughout its memo, the United States also uses the

15   plural form, and I think it does so to overstate Ali's actions

16   and to exaggerate the impact that he's had by his tweeting.

17          For example, at page 1, they state that his Twitter

18   account was used to facilitate travel to Syria for individuals

19   from other countries.  There's no evidence in this record that

20   anyone other than Reza Niknejad traveled or was influenced to

21   travel by Mr. Amin.

22          At page 2, the United States says he radicalized other

23   individuals in this very district.  There's no evidence in this

24   record that he radicalized anyone other than Reza Niknejad.

25   That's not to say that he wasn't trying to do that, and he has

1    pled guilty to tweeting and being part of a larger blogosphere

2    that supported ISIS.  And he has taken responsibility for doing

3    that.

4            But this record is barren of him actually accomplishing

5    that goal other than to Reza Niknejad.  He did not admit that in

6    the plea, and it's not part of the findings fact in this case.

7            What he did admit to, and he stands here guilty of and

8    he takes responsibility for, is participating in an effort to

9    convert Reza Niknejad to a radical form of Islam, and to some

10   degree, participating in his flight from the United States to

11   join ISIS.

12           The absence of evidence in this case that the

13   government asks this Court to conclude should not be used

14   against Mr. Amin to find that he actually influenced these

15   untold numbers of people.  In fact, the opposite should be true.

16   The fact that after eight months of investigating or more, the

17   government can't point to a single individual other than Reza

18   Niknejad should show that although he may have reached a number

19   of people, maybe even over a thousand people, that his influence

20   was actually very small.

21           The use of the plural to exaggerate the impact that Ali

22   had is also sort of companion with something else that the

23   United States does in their sentencing memorandum, which is to

24   engage in speculation about the worldwide impact.  For example,

25   on page 2, the government asks this Court to impose a lengthy

sentence because it's, quote, hard to measure the impact, quote,
on worldwide security.  And on the same page it says that he was
reaching untold numbers of people worldwide, again, impacting
worldwide security.

This is pure speculation.  It has no place in this
Court's consideration.  Mr. Amin has taken responsibility for
his actions.  He's pled guilty.  The findings of fact are before
this Court, and none of that is contained within those findings
of fact.

At page 3, the United States claims that Ali Amin
radicalized Reza Niknejad.  Again, Mr. Amin takes responsibility
for participating in that, but we submit that he's not the only
one who is acting on Reza.  Mr. Amin was radicalized by other
people.  He was a juvenile and remains a child before this
Court.

And while he takes responsibility for participating in
that, and it was clearly his intent to have that kind of impact
on Mr. Niknejad, he wasn't the only one doing that.  Ultimately,
we believe Mr. Niknejad had his own reasons, his adult reasons
for doing this, that are independent although related to the
impact that Mr. Amin had on him.

Mr. Niknejad was being radicalized by the same people
that radicalized Mr. Amin.  They're older, more experienced,
wiser, and more cunning people who have been supporters of ISIS
for a lot longer than either of these two young men.

1          Throughout its sentencing memorandum, the United States

2     holds Mr. Amin responsible for the radicalization of Reza

3     Niknejad and thereafter sort of indicates that his youth or

4     young age is a neutral, mitigating factor, and I have two

5     responses to that.

6          The first is that if a child can be held responsible

7     for radicalizing an adult as they're alleging, then that

8     certainly has to be a mitigating factor for that adult.  And if

9     Reza Niknejad ever comes back and is prosecuted, that's

10     something that should be taken into account.

11          And if that's mitigating for Mr. Niknejad, and I submit

12     that it is, then it has to be doubly mitigating when adults who

13     are much more experienced and versed in the language of

14     terrorism, in the language of radical Islam, operate on a child

15     starting when he was about 15 or 16 years old, and the

16     government discounts this and says it's neutral, but that belies

17     the truth about inexperience and a lack of wisdom.  It belies

18     the truth about Ali Amin's life up to that point.  And more than

19     anything, it belies neuroscience in what the United States

20     Supreme Court has said about youth as a mitigating factor.

21          It's very clear that the teenage brain is different

22     than adult brains.  It's underdeveloped.  The frontal lobes and

23     executive functioning which control impulse control, judgment,

24     and self-awareness are the last in the brain to develop.  And

25     this is sort of this perfect storm in a child's life.

1          During puberty, teenage brains sprout significantly

2     more dopamine transmitters.  And it's the dopamine transmitters

3     that are sort of burgeoning in a child's brain that leads to the

4     sort of impulsive activity as well as the need for immediate

5     gratification.

6          Neuroscience shows that teenage brains are hardwired to

7     take crazy risks, be heavily influenced by peers, particularly

8     when they know something bad is going to happen.  That's the

9     exact opposite of the human -- or the adult brain.

10          Peers act on each other in a way that is converging on

11     the weaknesses in the child's brain.  And I think that's what

12     happened in this case, especially when it's coupled with the

13     ready gratification of the Internet.

14          As we've laid out in our sentencing memorandum, part of

15     what drew Mr. Amin into the blogosphere and participating in

16     this was the fact that he was not getting answers to some deep

17     moral questions.  He was watching what was happening abroad and

18     looking to the adults in his life for guidance.

19          And while we don't blame those adults and he takes full

20     responsibility for what he did, the truth is that the Internet

21     gave him quick, ready, powerful, clear answers to these hard

22     moral questions.  I submit that they were the wrong answers, and

23     Mr. Amin now recognizes that.  But coupled with his teenage

24     brain, they had an out-of-sized impact on what drew him into

25     this.  That's how radicalization begins.

1          You act -- you set out grievances for someone and then

2    you give them increasingly radical intense responses to those

3    grievances that they get addressed, and that's what happened in

4    this case.

5          The United States Supreme Court in a series of cases

6    has specifically recognized that youth is a uniquely important

7    mitigating factor in sentencing.  So important, in fact, that

8    ten years ago in *Roper v. Simmons*, they abolished the death

9    penalty for people who commit crimes as juveniles.

10         Since then they've slowly peeled back sentencing,

11   specifically, mandatory life sentences in *Miller v. Alabama* and

12   *Jackson v. Hobbs* for youth.  States can still, if they elect to,

13   impose life sentences on juveniles, but youth has to be

14   considered.  So mandatory sentences for children are now out.

15         Last night as I was finishing my preparations, I did

16   research, and I found that there were 173 decisions from every

17   circuit in this country that had recognized that youth and

18   first-time offender status is an appropriate basis for granting

19   a downward variance or departure, including in the Fourth

20   Circuit, *United States v. Johnson*, 242 Fed. Appx. 7.

21         Related to youth as a mitigating factor is another

22   aspect of this which is sort of future risk or future danger.

23   It's one of the factors this Court can consider in deciding

24   whether a downward departure, which we've asked for, is

25   appropriate.  And the United States has asserted that he

1    represents a continuing threat because of his radical views.

2    There's a single sentence in their sentencing memorandum that

3    goes to that.

4          I am going to read briefly from a book about the

5    neuroscience of the teenage brain.  It's called *The Teenage*

6    *Brain, A Neuroscientist's Survival Guide to Raising Adolescents*

7    *and Young Adults*.

8          Even evidence looks different viewed through the lens

9    of neurology.  Crime rates rise steeply starting around age 13.

10   They peak at age 18 and then they start to fall again

11   dramatically.  When the statistics are presented in the form of

12   a graph, the result, the so-called age crime curve, looks like

13   the Matterhorn.  This pattern has been noted for more than a

14   hundred years, dating back to 1904, when psychologist G. Stanley

15   Hall, who is sometimes credited as the -- having invented

16   adolescence, and it holds true in the United States and in every

17   country where crime figures are met.

18         In the criminal law we call this phenomenon aging out,

19   that children are the most likely to commit crime.  That graph

20   goes up starting in early adolescence.  It peaks at about age 18

21   and then precipitously declines to about age 25 when people

22   after age 25 commit crimes at about the same rate as the rest of

23   the population.  It's this unique time period, and Mr. Amin is

24   within a month of his 18th birthday.  He's been incarcerated

25   since February.  This is the only crime that he's ever

1   committed, and it happened during that heartland time when the

2   brain is developing and they're most subject to influence.

3          In truth, Your Honor, Ali's characteristics show, I

4   think, that he's at no risk at all.  In this instance, he never

5   traveled and made no serious attempt to travel.  Even though one

6   of the people who was radicalizing him made a bank account

7   available to him for the specific reasons of going to Syria or

8   abroad to join the fight, Ali Amin never did that.  I think

9   that's a significant difference between him and all of these

10  other defendants that we've submitted in our brief and the

11  United States has submitted in theirs.  They all traveled or

12  made a serious effort to do that.

13         Another characteristic that shows that he's not likely

14  to re-offend is the fact that even before, a month -- well in

15  advance of a month of being arrested, he met with the FBI and

16  began a series of meetings in which he disclosed hours and hours

17  of information as to what he knew with no promise at all.

18         This is evidence of someone, even before there is a

19  criminal sanction, taking responsibility, admitting what he did

20  with his parents present and with clear implications.  He did

21  this with no promise of benefit for that time, and those

22  meetings continued uninterrupted immediately after he was

23  arrested.  In our first court appearance, I met with the U.S.

24  Attorney and indicated he wanted to continue those debriefings

25  and they never stopped.

1              There was an immunity agreement once he was charged,

2     but that's the only promise that he received throughout the

3     course of the debriefings.

4              The cooperation he's provided has been extensive in

5     detail.   There have been, I think at some point or another,

6     eight different investigators that have come in to talk to him.

7     His involvement has included not only answering 20 to 30 hours

8     of questions, but going on to computers and providing all the

9     answers that he could.

10             As far as I can tell, that has been satisfactory to all

11    of the law enforcement that's been involved.   And I say that

12    because it's indicative of two things.   One is his full

13    acceptance of responsibility, and second is that he has turned a

14    significant page in his development and in his life.

15             He's repudiated ISIS to me, to his family, to the imams

16    who have come to visit him, and to this Court.   That's further

17    evidence that he is not a risk.

18             Throughout his actions in court and in the debriefings

19    and his letter to this Court, he's expressed that he recognizes

20    the horrible impact that his crime has had upon Reza and his

21    family.   And this is one of the guiding forces in his life and

22    will be, I think, for the rest of his life.

23             A couple brief comments about the downward departure

24    and the downward variance that we've requested.   The Court can

25    take a defendant's criminal history or the fact that the

sentencing guidelines overrepresent the criminal history as a
factor in deciding whether to grant a downward departure which
it has discretion to do under Section 4A1.3.

And I submitted two cases of adult defendants,
*Benkahla*, which comes from this jurisdiction, and *Aref*, which
comes from New York, involving adults charged and convicted of
violating 18 U.S.C. 2339B, the same provision in place here.

*Aref* had committed a series of crimes.  I think there
were 27.  *Benkahla*, fewer.  Both of these men had traveled
abroad for the purpose of receiving training in different
terrorists organizations.

Unlike Mr. Amin, however, they did not plead guilty.
They did not take responsibility for their crime.  They
adamantly denied it.  They insisted on a trial.  And as far as I
can tell, even after they were found guilty, they did nothing to
denounce their prior behavior.

In those cases, both of those courts, and I submit that
Judge Cacheris had it best, they found that those adult
defendants, who are much older than Mr. Amin, engaging in a much
longer pattern of behavior, were sort of the quintessential
candidate for a downward departure.  And I submit that Mr. Amin
is the same, not only because he's taken responsibility for what
he did and he's admitted it, and he's put himself before this
Court, not denying any of this, but he's been providing
cooperation, and that is a sharp contrast to those two cases.

1          And lastly, in terms of the variance, it's hard to

2    imagine a constellation of mitigating factors under 3553 that

3    would warrant someone to be more deserving than Mr. Amin for a

4    lesser sentence.

5          I will not reiterate all of those things here, but

6    youth is an extremely powerful mitigating factor here.  And I

7    think that the sentencing guidelines allow this Court to take

8    that into account, both in terms of granting a downward

9    departure, but also for considering a downward variance.

10          As his lawyer, I've had the honor of representing

11   Mr. Amin and working with his family during this very critical

12   period for him and the family.  Throughout that representation,

13   Mr. Amin has treated every person he's come into contact with

14   with the utmost respect and dignity.  He's never expressed

15   concern for himself or the punishment that he's going to

16   receive.  His focus has always been on his own family and Reza

17   Niknejad's family and the harm that he's caused both.

18          He has been steady and consistent with his intent to

19   correct his mistakes and to atone for his crimes and the harm

20   that he's caused.  He has done that to this Court, to every

21   lawful authority, law enforcement, the U.S. Attorney,

22   international investigators, who have brought these charges or

23   pursued information that he has that might be helpful to other

24   investigations.

25          He has atoned for his crimes with his family and

1   continues to do so, and more than anything, with his creator.

2   Throughout the sentencing memorandum, and in particular in his

3   statement, he's acknowledged getting off the path of a dutiful

4   Muslim.  He is a faithful, sincere, religious young man, and he

5   was misguided and he takes responsibility for that.

6        As his lawyer, I can't help but recognize that adults

7   with their own motivations to impact him bear some

8   responsibility, but as he sits there before this Court, he takes

9   full responsibility.

10        He's acknowledged that he took a distorted view of his

11   faith to justify violence and that this was a grave error and

12   has caused grievous harm to Reza and his family.  He has taken

13   full responsibility for his crimes and the consequences that

14   it's had on our culture, on his family, and on the people who

15   loved Reza.

16        He's a remarkably gifted and compassionate young man

17   who became lost in the search for identity and a yearning for

18   acknowledgement.  And I submit that the Internet provided both

19   of those things in an instantaneous, powerful way that acted

20   upon his juvenile brain.

21        In truth, he was manipulated by older, ill-intentioned

22   radicals who recognized both his intellectual gifts and the fact

23   that he was impressionable.  The sentence we've requested takes

24   into account both the seriousness of his crime, his youth, but

25   also the tremendous changes that he has undergone since even

1    before his arrest and the remarkable potential that he has to

2    contribute to society.

3           For all of those reasons, we would ask the Court to

4    impose a sentence of 75 months with two recommendations because

5    this sentence is sufficient punishment but not greater than

6    necessary to serve the ends of justice.

7           Thank you.

8           THE COURT:  All right.  Is there anything you want to

9    add?

10          MR. BEN'ARY:  A few points, Your Honor.

11          This defendant, Your Honor, is an exceptional

12   individual.  That is clear from his attorney's comments, from

13   the sentencing position paper, and from the facts that underlie

14   this case.  He's exceptional because for his age, he's extremely

15   bright, he is extremely articulate, and this exceptionalism

16   allowed him to not be radicalized the way that Mr. Flood talks

17   about.

18          The AmreekiWitness Twitter account and the posts over

19   4000 -- or over 7000 in number to 4000 followers show that he

20   wasn't being radicalized.  He was radicalizing.  That's because

21   he had the capacity to talk that talk, to be persuasive, to

22   provide religious authorities justifying what he well knew were

23   atrocities being committed by ISIS.

24          I think it is evident in reviewing the AmreekiWitness

25   accounts that this defendant knew well that his conduct in

1    providing support to them was illegal, was atrocious, that they

2    were involved in beheadings, that they were involved in violence

3    against innocent individuals, and yet he still is advising

4    people who, some of whom we'll never know, to join them, to

5    fight with them.

6           We do know that he sent someone he was personally

7    acquainted with, Reza Niknejad, to join in those atrocities and

8    has already sentenced him to what in a best-case scenario will

9    be a long prison sentence if he ever returns to the United

10   States, the former likely is a death sentence.  Because when you

11   go join ISIS, Your Honor, that's what you're going to do.

12   You're going to die in their violent battle against people that

13   they agree with.

14          A couple of points on the impact.  Again, the

15   AmreekiWitness Twitter account was -- Twitter account and

16   related accounts were extensive.  I talked about the number of

17   tweets and followers.

18          In terms of local impact, we certainly know about Reza

19   Niknejad.  In the statement of facts, there's also another named

20   coconspirator that comes from this district mentioned.  So it is

21   more than just Reza Niknejad who has been impacted by Mr. Amin's

22   conduct in this case, a conduct that he knew was in support of a

23   group that was brutal and engaged in violence.

24          When we talked about Reza being an adult and Mr. Amin

25   being a child, I would like to ask the Court to keep in mind

1    Reza Niknejad is 18.  This defendant is 17.  They're more or

2    less contemporaries.  It's true that by turning 18 you achieve

3    the legal status of being an adult, but it was Mr. Amin that

4    guided Reza Niknejad on his path to Syria.  He was involved in

5    proselytizing him.  He was involved in getting him set up with

6    others who were planning to travel to Syria to join ISIL.  The

7    statement of facts talks about him meeting up with foreign

8    travelers over in Turkey.  This defendant set that up.

9         This defendant helped get Mr. Niknejad to the airport.

10   This defendant delivered material to Mr. Niknejad's family after

11   he left that was sort of a condition of Mr. Niknejad going.

12        So Mr. Niknejad certainly made his own decisions, but

13   he was guided at every step of the way by this defendant.  And

14   when I say that this defendant has sentenced him to the fate

15   that he has, I do not believe that is at all an exaggeration.

16        In terms of the cases that the defense points out, I

17   would just mention briefly, Your Honor, that in the *Conley* case

18   out of Colorado and the *Wolfe* case out of Texas, both of those

19   individuals attempted to travel for themselves to join groups

20   overseas.  They were both stopped at the airport.

21        In this case, the same -- that there was no travel

22   because it was prevented is simply not true.  We do know of one

23   individual from this district that traveled, and we know that he

24   met up with a group of overseas individuals in Turkey who also

25   traveled.  So this defendant has a hand in actually providing

1    personnel to ISIS where these other individuals do not.  That is

2    a major distinction that I would ask the Court to draw.

3         In terms of the 3553(a) factors, certainly the

4    defendant's circumstances are something that the Court needs to

5    consider heavily.  And the Court is going to consider, I'm

6    confident, that the defendant has no prior history, which is

7    completely appropriate.  The Court is going -- criminal history.

8    The Court is going to consider his age, but, again, when

9    considering his age, Your Honor, I think you also need to

10   consider his abilities, the fact that he clearly understood what

11   ISIS was up to, that he clearly understood his conduct was

12   illegal, and he did make a choice.

13        He at some point was radicalized, but during the

14   important time period for this case, he was the one who was

15   using his intellect, using his ability to do the radicalizing.

16   That is why he was able to have such an impact.

17        In terms of the scope of the conduct, again, with the

18   use of social media accounts like Twitter, like ASKfm, it is

19   sincere that it is impossible to know the full impact of the use

20   of the AmreekiWitness accounts.  We know that it was worldwide.

21   We know that people followed him.  We know -- but we cannot

22   individually identify each of those witnesses and know whether

23   they traveled to support ISIL, whether they traveled to support

24   another terrorist group.  We just simply can't know it, and I

25   think that that's an important recognition.

1            What we do know in terms of local impact is there's a

2   family in Prince William County that's missing their son and

3   likely will never see him again because he's going to die

4   fighting in Syria for a terrorist group.  That's an awful fate,

5   and this defendant had an enormous hand in that.

6            Yes, Reza Niknejad made his own decisions that the

7   United States has recognized, but his hand was guided at every

8   step by Ali Amin.  Even though Ali Amin was under 18 and Reza

9   Niknejad was over 18, he's likely not coming back.  That's

10  something that the Niknejad family is going to live with.

11  That's something that the community of this district and Prince

12  William County is going to have to deal with.

13           Now, what activity Reza Niknejad is engaging in between

14  now and his demise we also don't know.  Has he killed soldiers?

15  Has he conducted attacks?  When you provide personnel to a group

16  like ISIL that's engaged in the conduct that they're engaging

17  in, it's dangerous to the security of the region.  It's

18  dangerous to the United States national security.  It's

19  dangerous to worldwide security.

20           So we know that Reza Niknejad is over there engaging in

21  that conduct, and we know that the AmreekiWitness Twitter

22  accounts could have certainly encouraged or facilitated other

23  individuals to do the same.

24           Based on the scope of that conduct, Your Honor, the

25  fact that we know enough about it to know that it's had a grave

```
 1   impact locally, nationally, and internationally, we ask the
 2   Court to impose a sentence that reflects the defendant
 3   individually as well as the impact that his conduct has had on
 4   security worldwide.
 5           THE COURT:  Mr. Amin, would you come to the podium.
 6           Is there anything you want to say at this time?
 7           THE DEFENDANT:  Yes, sir.
 8           I stand before the Court today taking responsibility
 9   for my actions.  I have not attempted to deny or explain away
10   anything I have done.
11           I have willingly provided information about my actions
12   I took against the law before and after my arrest, even to my
13   legal harm at first.  Jail was not needed to cause me to feel
14   guilt.
15           I abandoned Twitter on my own and often repented for my
16   presence on it.  I was offended by the toxicity of the so-called
17   radical community and all but shut down AmreekiWitness of my own
18   accord.
19           I have long held regret for speaking so loudly with so
20   little Islamic authority, having done so little research, been
21   so hasty, and likely fueling a poisonous environment.
22           Even before the government had the Witness account
23   banned, I resolved not to have an ideological public profile
24   until I had done a lot of growing.  I have long found the
25   suffering Reza's family, particularly his mother, must be
```

1  experiencing.

2       Although I know I cannot be responsible for anyone

3  else's actions, I know that I carry a burden.  There was an

4  element of confidence I broke in my dealings with Reza in

5  relation to his family.  I can never expect their forgiveness,

6  let alone my own family:  My biological father who I may be

7  unable to build a meaningful with whose grief bears on me, a

8  beloved toddler sister, and an infant bother who will be haunted

9  by events beyond their scope.

10      No words can explain the weight suffocating my

11  conscience in regards to my mother.  I may never be able to

12  repay them for what they have and will experience as result of

13  my deeds.  I am trying to discover the truth.  In an age when

14  deep religious devotions are seen with suspicion as

15  unfashionable, I pray.  I pray with sincerity for guidance.  I

16  am humbled by god's love and patience as I stumble along the

17  path.

18      I resolve to follow the truth no matter how difficult,

19  however different from my current beliefs, without care of the

20  pain of the splinters that burrow from opposing the grain.  That

21  dedication to inquiry is the basic principle I have tried to

22  live the past few years of my life.

23      I have never claimed to have all the answers.  My

24  spiritual journey has only just begun.  I maintain a desire to

25  learn, to think, to ponder.  Should reason and proof reveal me

mistaken, then I cannot continue in error, and I am open to reconsideration and have given a variety of voices a chance to win my conviction.

With the possibility that I may face incarceration in a harsh penitentiary for a period almost as long as my entire life, I'm afraid I see little opportunity for immediate reform. I have spent nearly seven months in a jail unequipped to give me any education, legitimate medical attention, a totally religiously permissible diet, and without other important facilities.

No, I have not broken nor have I mindlessly discarded my beliefs due to hardship. I have, however, resolved not to blindly become more radical. I have not now become the hateful mullah that some have claimed I always was. I hope never to become a brainless product of difficulty, ridiculously passive, or irrationally violent.

I am ready to accept any punishment with the brightest hope. My allegiance has never been to any party or faction, but to the unending, tireless devotion of establishing some semblance of heaven's kingdom on earth as ever may be realized. That I might be blessed by the one who is patient with my flaws with the eternal fields of another plane. I do not ask for or expect sympathy. Whatever other factors affected me, I am ultimately responsible for my deeds.

I do not blame medical, family, or psychological issues

1  to exonerate me.  I do not blame the imams who were too busy or

2  incapable of engaging me or those who introduced me to militant

3  thought.  I made my decisions and am prepared to bear their

4  fullest consequence.  Thank you.

5          THE COURT:  You need to remain at the podium.

6          I find that the probation officer has properly assessed

7  the guideline factors in this case, but obviously a downward

8  departure is appropriate, first of all, because of the maximum

9  sentence involved in this case.

10          Also, considering the factors which I must under

11  Section 3553 and considering your actions in this offense,

12  considering your age and your lack of record, with any prior

13  criminal record, it will be the sentence of the Court that you

14  be committed to the custody of the Attorney General to serve a

15  term of 136 months, a life term of supervised release, and pay a

16  special assessment fine of a hundred dollars.

17          I find because of your financial condition, the

18  imposition of any fine or cost is not warranted.

19          There are a couple of conditions of your supervised

20  release.  The first is that you provide any financial

21  information that may be required by your probation officer;

22  second, that you subject yourself to any screening or monitoring

23  of the Internet by your probation officer.

24          I will recommend that your time be served at our

25  institution at Butner.

1              MR. FLOOD:   Thank you, Your Honor.

2              THE COURT:   Thank you.

3              * * *

4         (Proceedings concluded at 9:40 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3          I certify, this 15th day of September 2017, that the

4    foregoing is a correct transcript from the record of proceedings

5    in the above-entitled matter to the best of my ability.

6

7                               /s/

8                    _____
                     Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25